**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA**     ) | |
|                    ) | |
|       v.             ) | **Criminal Action No. 2018-0017** |
|                    ) | |
| **COLIN MERCHANT and DELIA JAMES**  ) | |
| **MERCHANT,**           ) | |
|                    ) | |
|       **Defendants.**     ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Melanie L. Turnbull, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Colin Merchant*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Colin Merchant's ("Defendant" or "Merchant") "Motion to Suppress Physical Evidence and Statements" (Dkt. No. 31) ("Motion to Suppress"); the Government's Opposition thereto (Dkt. No. 32); and the arguments made at the suppression hearings. For the reasons discussed below, the Court will deny Defendant's Motion.

## I.     BACKGROUND

On November 15, 2018, the Government filed an Indictment against Defendant Merchant and his co-defendant Delia James-Merchant ("James-Merchant"), who is Merchant's spouse. Defendants were charged with Possession with Intent to Distribute Marijuana, in violation of 21

U.S.C. §§ 841(a)(1) and (b)(1)(D), and Manufacture of Marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D).[1]

At the initial suppression hearing,[2] the Government introduced several exhibits and offered the testimony of Virgin Islands Police Department Task Force Officer ("TFO") Moses President ("TFO President"), who is currently assigned to the Drug Enforcement Administration's ("DEA") High Intensity Drug Trafficking Area ("HIDTA") St. Croix Resident Office, and DEA Special Agent Jeremy Latchman ("SA Latchman"). Merchant testified on his own behalf and also introduced exhibits into evidence. At the second suppression hearing, TFO President testified. The following evidence emerged from the testimony of the various witnesses.[3]

TFO President testified that on July 25, 2018, he was driving by a property located in Estate Grove Place in Fredriksted, St. Croix, and, based on his training and experience, he suspected that it concealed a marijuana grow operation. The property was "surrounded" or "barricaded" by blue tarp, and there was a large blue water tank on the premises. TFO President testified that individuals who maintain a marijuana grow operation typically use tarp to hide it and water tanks to water the marijuana plants.

Due to his suspicions, TFO President conducted aerial surveillance of the property on two

---

[1] Prior to the Indictment, the Government commenced this action by filing a Criminal Complaint on August 24, 2018 (Dkt. No. 1), followed by an Information on September 14, 2018 (Dkt. No. 18).

[2] An evidentiary hearing, wherein most of the testimony was presented, was held on February 13, 2019. As a result of its determination that additional evidentiary issues remained outstanding, the Court ordered a continuation of the hearing for April 5, 2019.

[3] The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Merchant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

occasions: August 2, 2018 and August 22, 2018. By doing so, he observed what appeared to be marijuana plants growing on the property. TFO President also testified that on another occasion he observed Merchant, James-Merchant, and two minor children on the property.

TFO President applied for a search warrant with Magistrate Judge George W. Cannon, Jr. In his application, TFO President submitted an affidavit and attachments A-C as exhibits—all of which were presented to the Magistrate Judge. (Govt. Ex. 36). TFO President's affidavit contained a summary of his investigation and the grounds upon which he based his determination that probable cause existed. Attachment A was an aerial photograph of the subject property, showing the blue water tank, the blue tarp around the property, and two cars that were parked at the front of the property—one red car and one light brown in color. Attachment B described the property to be searched as follows:

1. Address: <u>#43 Estate Grove Place Fredriksted, St. Croix</u> and its curtilage including a red vehicle and a gold vehicle located on the property.

2. #43 Estate Grove Place, Frederiksted, is described as a single level yellow in color wooden structure, with a white galvanized roof. The structure has metal louvered windows. A blue tarp fence conceals the front of the residence and runs along the left side towards the rear of the residence, if facing the residence. A blue water tank is located to the front right corner of the residence. A red small vehicle is parked parallel to the left front of the residence, in between the chain link fence and the blue tarp fencing. A gold vehicle is parked parallel to the front right of the residence adjacent to the chain link fence with a blue tarp covering the rear window. The chain link fence does not have a gate blocking the driveway up to the front of the residence. There are no visible markings on the residence indicating an address.

(Govt. Ex. 36). Attachment C to the warrant application listed the items to be seized. These items were: (1) Marijuana; (2) Drug Paraphernalia; (3) Weapons; (4) Ammunition; (5) Currency; (6) Marijuana cultivation equipment; (7) Fans; (8) AC Units; (9) Notes; (10) Ledgers; (11) Cellular Phones; and (12) Computers/Electronic media storage devices. (Govt. Ex. No. 36).

TFO President testified that there was no other house nearby that matched the description in Attachment B. To obtain the physical address of the subject property, TFO President, accompanied by SA Latchman, went to the Virgin Islands Lieutenant Governor's office, obtained a map of Grove Place, and was provided with a corresponding address to the plot he identified, which was #43 Estate Grove Place.

On August 23, 2018, Magistrate Judge Cannon issued a search warrant for #43 Estate Grove Place.[4] The section entitled, "In the Matter of the Search of," was filled in as: "#43 Estate Grove Place, Fredriksted, St. Croix, Attachment A." *Id*. The warrant further stated:

> Affidavit(s) having been made before me by Moses President who has reason to believe that on the person or on the premises known as: No. #43 Estate Grove Place, Fredriksted, St. Croix, Virgin Islands 00850, as shown in Attachment A and more particularly described in Attachment B (Attached to the Search Warrant Affidavit) . . . there is now concealed evidence, namely 'See Attachment C.'

*Id*. TFO President testified that, to prepare for the search, the team held a briefing the day before and the morning of the search to review the items to be seized.

On August 24, 2018, at approximately 7:00 a.m., eight or more members of the DEA and HIDTA, including TFO President and SA Latchman, executed the search warrant on the property listed as #43 Estate Grove Place. Upon arrival, the officers knocked on the door and announced themselves at least twice, saying, "Police, Search Warrant." The officers heard commotion inside and, according to both TFO President and SA Latchman, someone replied, "were coming" or "I'm coming, I'm coming to the door." However, the door was not opened. The team forced entry by using a battering ram and had their weapons drawn as they entered the house. Once inside the

---

[4] The warrant application, along with the attachments, was filed under seal on August 23, 2018 (Criminal Matter No. 18-mj-27, Dkt. No. 1)—the same day the warrant was issued (*Id*. at Dkt. No. 2). On the afternoon of August 24, 2018, after the search of Defendant's property was completed, the documents were unsealed and the executed search warrant was filed. (*Id*. at Dkt. No. 3). Thus, at the time the search was executed, the warrant and the attachments were under seal.

residence, TFO President said he saw Merchant, James-Merchant, and two minors. The team cleared the home, Merchant was handcuffed, and he and his family were all brought outside to sit under a make-shift porch in the front of the house.

While Defendant and his family were outside, TFO President showed Merchant the search warrant—without the attachments—and asked him if his name is Colin Merchant. Merchant said yes. Then TFO President asked Merchant if his address was #43 Grove Place. James-Merchant interjected and said that the officers had the wrong address, as the lease for their property listed a different address: 42E Grove Place. (Def. Ex. No. 2). TFO President then handed James-Merchant the search warrant.

Upon reviewing the warrant, Defendants did not ask for additional information or ask to review the referenced attachments. Defendants also did not ask TFO President what items they were searching for, nor did he recall whether he provided them with that information. However, TFO President conceded that, without providing the attachments, Defendants would not have known the specific items to be seized, as the warrant did not list those items.

TFO President stated that he had no reason for withholding the attachments from Defendants.[5] He testified that, although he had received training in executing search warrants, he did not recall being instructed that he should serve attachments, only that he should provide a copy of the search warrant itself. TFO President stated: "[T]hat is the way I've always done it. I've never been questioned or told about it."[6]

---

[5] TFO President testified that when he first entered Defendant's residence, he did not have the search warrant on him. After the team made entry, he went to his vehicle and retrieved the search warrant but not the attachments. While the attachments were also in the vehicle, the warrant and attachments were not stapled together.

[6] TFO President also testified that he has been a case agent in five search investigations and participated in about 10-12 others. He was unaware as to whether, as a matter of course, other

While the search was being executed on Merchant's property, both SA Latchman and TFO President testified that Merchant was not questioned. However, they acknowledged that neither of them was with Merchant the entire time the search was being executed. TFO President also recalled that while the search was underway, without prompting or questioning, James-Merchant said, "why is there a search warrant for the residence? It's trees being grown in the ground, [and] there's only 40 something plants." SA Latchman further recalled that at one point, without any questioning, James-Merchant blurted out, "it was only about 40 plants."

The following items were seized from the premises: 107 marijuana plants growing in pots and in different stages of growth; a quantity of drying and processed marijuana; and several clear plastic vials containing processed marijuana. (Dkt. No. 1-1 at 1-2). According to TFO President, no items beyond the scope of the warrant were seized.

After the search was completed, both Merchant and James-Merchant were transported to the HIDTA office, located in the federal courthouse in St. Croix. Merchant was escorted by TFO President and SA Latchman. Upon their arrival at HIDTA, Defendants were arrested and processed.[7] TFO President and SA Latchman then questioned Defendants separately.

SA Latchman testified that, prior to questioning, he explained two things to Merchant. First, SA Latchman told Merchant that he had the right to have his interview recorded and presented him, alternatively, with a declination of recording form. Merchant reviewed and signed the form, indicating he did not want to be recorded. (Govt. Ex. 4). Second, SA Latchman advised

---

officers provided copies of attachments which are expressly incorporated in a search warrant to individuals whose properties are subject to a search.

[7] TFO President stated that, while at the HIDTA office, he was not with Defendant the entire time while the latter was being processed.

Merchant of his *Miranda* rights, verbally reading each right to Merchant from a *Miranda* Advice of Rights form. According to SA Latchman, Merchant wanted to read the form, so he took the form from SA Latchman and reviewed it himself. SA Latchman instructed Merchant that if he did not have any questions after he finished reading the form, he should place his initials next to each *Miranda* right. He also instructed Merchant to answer "yes" or "no" if he understood these rights and if he was willing to make a statement.[8] SA Latchman testified that Merchant wrote his initials next to each *Miranda* right; wrote "yes" in response to the questions regarding the understanding of his rights and his willingness to answer questions; and wrote his initials in the Waiver of Rights section indicating that he had read the form, understood his rights, and was willing to answer questions without a lawyer present.

A copy of the Advice of Rights form was admitted into evidence at the suppression hearing. (Govt. Ex. No. 1).[9] The document shows Merchant's initials, "CM," beside each of the Miranda

---

[8] TFO President also testified that, prior to questioning, both Defendants were advised of their rights, and they both signed the *Miranda* Advice of Rights form. Both Defendants also signed the declination of recording form, and both subsequently provided statements to the officers.

[9] The form states as follows:

YOUR RIGHTS
BEFORE WE ASK YOU ANY QUESTIONS, DO YOU UNDERSTAND

_ You have the right to remain silent.
_ Anything you say can be used against you in court.
_ You have the right to talk to a lawyer for advice before we ask you any questions.
_ You have the right to have a lawyer with you during the questioning.
_ If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
Do you understand your rights?
Are you willing to answer some questions?
WAIVER OF RIGHTS
_ I have read or _ someone has read to me this Advice of Rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer some questions without a lawyer present.
(Govt. Ex. No. 1).

rights; the word "yes" next to the two questions regarding his understanding of his rights and his willingness to answer questions; and Merchant's initials in the Waiver of Rights section indicating that he had read and understood his rights, and was willing to answer questions without the presence of a lawyer. *Id*. SA Latchman testified that the form was signed by Merchant, SA Latchman, and TFO President, and the form bore their signatures.

According to TFO President and SA Latchman, Merchant's interview was conducted in a "calm," "conversational" and "pleasant" atmosphere, and neither officer raised their voices. Merchant was not handcuffed nor shackled and neither officer unholstered their weapons. The interview took place in a conference room and, while the door was closed, it was not locked. The bathroom was made available to Merchant, and Merchant was offered water, which he declined. The interview lasted approximately 30 to 40 minutes. Prior to the administration of Merchant's *Miranda* rights, Merchant stated that he had completed high school and two years at the University of the Virgin Islands, and that he did not have any issues understanding the English language. Merchant at no point asked for an attorney or indicated that he did not understand what was happening.

In response to questioning during the interview with law enforcement, Merchant revealed the following information: that he had approximately 100 marijuana plants; that he had planted them about three months before; that they were planted in various stages of growth; and that his purpose in planting the marijuana plants was to generate income for his family as he was unemployed.

Merchant testified on his own behalf at the suppression hearing. He stated that while he had two cars parked on his property—one red and one champagne colored vehicle—his address, as listed on their lease, is #42E Grove Place. Merchant further stated that he has lived on this

property for six years. Merchant reported that #43 Estate Grove Place is the address of a property three houses down from his. He described the cars parked in that yard and the fact that the house on that property was off-yellow in color and had the same color roof as his house. However, he was unable to recall whether that property was similarly surrounded by blue tarp. Merchant also acknowledged that, while his house is wooden, the other house was made of concrete and wood.[10]

Merchant testified that, on August 24, 2018, around 5:45 a.m.,[11] he heard somebody say, "open up, police," and he thought it was one of his neighbors playing a prank. However, Merchant's wife looked out the window and told him it was the police. Merchant said, "hold on a minute, I'll be right there." According to Merchant, as he was walking toward the door, the police kicked it open and about seven to eight officers came inside. Merchant panicked because he was naked and the police came in with guns drawn and placed him and his wife against the wall, yelling that the Merchants had guns and to look for guns. Merchant asked the police officers if he could put boxers on and he was permitted to do so. He testified that the officers searched his person twice. While he was being searched, Merchant told the officers that he had no weapons. He was handcuffed by VIPD Officer Cornwall and led outside along with his family. Merchant further testified that officers began questioning him.

Merchant stated that he asked to speak to his lawyer more than seven or eight times throughout the entirety of his encounter with the police, and that his requests were ignored.[12] In

---

[10]  In response to Merchant's assertion that #43 Estate Grove Place was the address of another property down the street, TFO President stated that the other property did not have a water tank like Merchant's on the premises.

[11]  Merchant stated that he was sure it was 5:45 a.m. because he looked at a clock on his bedroom wall, at the moment of the event.

[12]  Merchant stated that his wife also asked to speak with a lawyer.

this regard, Merchant said that as soon as the officers started to search him at his home, he told them that he needed to call his lawyer. Merchant testified that an officer grabbed his phone, saying, "you don't need that." Merchant also testified that he asked for a lawyer while he was in the car with TFO President and SA Latchman, and neither officer acknowledged him. Merchant stated that he once again asked for a lawyer during booking, but the officer only smiled at him in response. Merchant explained that his understanding was that he had to complete booking before he could see his lawyer and that, prior to questioning, he would have an opportunity to meet with his lawyer.[13] Merchant further stated that, while this was the first time he had been arrested, he knew the first thing he had to do was to speak with an attorney.

During cross-examination, Merchant stated he asked for a lawyer before his interview with the officers began. He also testified that he did not realize his interview was a formal interrogation because the meeting was portrayed by the officers as "not on the record," and Merchant thought they were "just sitting and talking." While acknowledging that he initialed and signed the *Miranda* waiver form, Merchant stated that when asked if he was willing to answer questions, he answered "yes" only "with the promise that [his] lawyer was going to be present with him."

In his Motion to Suppress, Merchant seeks to suppress all physical evidence gathered and statements made to law enforcement during and after the search executed upon his residence on August 24, 2018, on the grounds that such evidence was obtained in violation of his Fourth and Fifth Amendment rights. (Dkt. No. 31 at 4-13). In opposition, the Government contends that no such constitutional violations occurred. (Dkt. No. 32 at 5-14).

---

[13] In response to this assertion, TFO President testified that he never told Merchant that he had to go through booking before he could see his attorney.

## II.    SUPPRESSION OF EVIDENCE

Merchant argues that all evidence should be suppressed as the product of an illegal search. Specifically, Merchant contends that the search warrant executed on his property was invalid as it failed the "particularity" requirement of the Fourth Amendment in two respects: (1) the warrant listed the wrong address (Dkt. No. 31 at 5-6); and (2) the attachments did not accompany the warrant when the warrant was served on Defendants.

The Government maintains that regardless of an incorrect address, the warrant was sufficiently particular. The Government further maintains that since the search was led by TFO President, who had prior knowledge of the premises, his participation eliminated any possibility that the wrong property would be searched. (Dkt. No. 32 at 8-9). Finally, the Government argues that even if the warrant was invalid because the attachments were not provided to Defendants, such a violation does not warrant suppression.

### A.    The Warrant

The first issue before the Court is whether the warrant served upon Defendants satisfied the Fourth Amendment's particularity requirement so as to render the search of Defendant's property valid.

#### 1.    Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches" in their homes. U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation omitted). The Fourth Amendment requires that warrants "shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched, and the persons or things to be seized.*" U.S. Const. amend. IV (emphasis

added). The purpose of the Fourth Amendment's particularity requirement is to prevent general exploratory searches, wherein "the police . . . rummag[es] through a person's belongings," *Bartholomew v. Com. of Pa.*, 221 F.3d 425, 428 (3d Cir. 2000) (quoting *United States v. Johnson*, 690 F.2d 60, 64 (3d Cir. 1982)), as well as to "assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) (internal citation and quotation marks omitted) . *See also Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit"). Accordingly, "the scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Id*. The particularity requirement is thus satisfied when "the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended," *Steele v. United States*, 267 U.S. 498, 503 (1925), and when the warrant "describe[s] the items to be seized." *See Groh*, 540 U.S. at 558.

In instances where a warrant incorporates an affidavit or attachments which describe the places to be searched and/or list the items to be seized, there are two conditions that must be met to ensure that such supporting documents are properly incorporated and that the warrant is properly executed to satisfy the Fourth Amendment's particularity requirement: (1) the warrant must expressly incorporate the affidavit or attachments; and (2) the affidavit or attachments must accompany the warrant when the search is executed. *United States v. Wright*, 493 F. App'x 265, 268 (3d Cir. 2012) (establishing that "warrants [] seek[ing] to satisfy the particularity requirement through incorporation by reference to an affidavit[] [must] . . . expressly incorporate the affidavit, and the incorporation must be clear . . . [and] the affidavit must accompany the warrant; it cannot

be impounded and sealed") (internal citation and quotation marks omitted); *see also Groh*, 540 U.S. at 557-58 ("a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant"); *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004) ("[I]t is perfectly appropriate to construe a warrant in light of an accompanying affidavit or other document that is incorporated within the warrant. But to take advantage of this principle of interpretation, the warrant must expressly incorporate the affidavit."); *Bartholomew*, 221 F.3d at 428 ("[W]hen a warrant is accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant.") (quoting *Johnson*, 690 F.2d at 64 (3d Cir. 1982)). Generally, "[o]n a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable," including those challenges which pertain to whether a warrant's particularity requirement has been satisfied. *United States v. Ritter*, 416 F.3d 256, 261-9 (3d Cir. 2005).

## 2. Analysis

The Court finds that while the warrant satisfies the first prong of the Fourth Amendment's particularity requirement in that it properly incorporated the supporting documents, it fails the second prong in that the warrant was not accompanied by the supporting documents when it was served on Defendants.

### a. Incorporation of Supporting Documents

The Third Circuit has established that incorporation of supporting documents must be expressed in "definite," "clear," and "explicit[]" language. *Doe*, 361 F.3d at 239. In this case, the warrant contains express language that incorporates and identifies Attachments A-C, which TFO President submitted with the warrant application. Specifically, the section of the warrant entitled,

"In the Matter of the Search of," identifies "#43 Estate Grove Place, Fredriksted, St. Croix, *Attachment A*." (Govt. Ex. 36) (emphasis added). The warrant further provides that the place to be searched is "more particularly described in *Attachment B (Attached to the Search Warrant Affidavit)*" and identifies evidence to be seized by reference to "See Attachment C." The Court finds that by virtue of its "clear" and "explicit" language, the warrant here was "written with objective definition," and with a "scope [that is] discernible to those who are bound to submit to its authority, whether they are police or subjects of the search." *Groody*, 361 F.3d at 242-43; *see also Yusuf*, 461 F.3d at 394 (finding that the warrant "incorporated" the exhibit submitted with the warrant application which "specifically identified the items that the government intended to seize").

The fact that the warrant here had the wrong address (#43 Grove Place instead of #42E Grove Place) did not render it invalid for failing the particularity requirement because the supporting attachments—which the warrant expressly incorporated—sufficiently described the property to be searched so that law enforcement was able to "ascertain and identify the place intended." *Steele,* 267 U.S. at 503; *see also United States v. Joseph*, 174 F. Supp. 539, 544 (E.D. Pa. 1959), *aff'd,* 278 F.2d 504 (3d Cir. 1960) (where the court found that despite the search warrant containing the wrong address, this did not make the warrant invalid as "[n]o showing was made that there was any adjoining building likely to be confused with the [defendant's premises], regardless of which address or which entrance was specified") (citing *Steele*, 267 U.S. at 498).

Here, the attachments to the warrant assured that the officers would execute the search on the correct property. Attachment A was a colored aerial photograph of the property. Attachment B specifically described the property as a single-level wooden yellow structure with a white galvanized roof and metal louvered windows, and a blue tarp fence running along the left side of

the residence to its rear. The description also included the fact that a blue water tank was located to the "front right corner of the residence" and a red and a gold vehicle were parked in the yard— vehicles which Merchant confirmed as his own and were shown in the aerial photograph submitted in Attachment A. Meanwhile, Attachment C identified the specific items to be seized during the search of the property.

The Court rejects Defendant's argument that a nearby property also matched the warrant's description, rendering the warrant insufficiently particular. According to the evidence, that property, while also painted yellow, was—unlike Merchant's—made of wood and concrete and did not have the blue tarp fencing that lined Merchant's property, the blue water tank, or the red and gold vehicles parked in the front yard. Further, the warrant in this case was executed by a team of officers which included TFO President, who had intimate knowledge of the property as a result of his various surveillances—including two aerial surveillances—and who had applied for the warrant. In fact, in one of the surveillances, TFO President had observed Merchant and his family on the premises that was actually searched. *See United States v. Turner*, 770 F.2d 1508, 1511 (9th Cir. 1985) (finding warrant was sufficiently particular, despite the wrong address listed on the form, because, *inter alia*, the warrant was executed by an officer who had participated in applying for the warrant and who personally knew which premises were intended to be searched; and the "premises that were intended to be searched were those actually searched."); *United States v. Deloera-Escalera*, 636 F. App'x 977, 980 (10th Cir. 2016) (finding warrant was valid in that it "clearly enabled the executing officers to locate and identify the premises with reasonable effort" due to the detailed description contained in the warrant which included the "orientation, composition, and [] colors" of defendant's residence to be searched and the officer's "prior observation of and familiarity" with the property to be searched).

Thus, the error in the address is insufficient to invalidate the warrant at issue, which incorporated a detailed description of the property and was executed by an officer who was personally familiar with the property to be searched. *See United States v. Slotcavage*, 1997 WL 431002, at *5 (E.D. Pa. July 16, 1997) ("Technical errors in the warrant and affidavit, including erroneous addresses, will therefore not necessarily invalidate a warrant and subsequent search . . . The detailed description of the building [provided by the officer] more than made clear what place was to be searched."); *U. S. ex rel. Hurley v. State of Del.*, 365 F. Supp. 282, 288 (D. Del. 1973) (denying defendant's motion to suppress because the court did not find it fitting to "invalidate a search warrant on the hypertechnicality that the exact address of [defendant's property] may have been erroneous when the intent of the warrant was so clear," as evinced, *inter alia*, by the warrant's description of the property to be searched); *see also United States v. Ventresca*, 380 U.S. 102, 108 (1965) (holding that in assessing the particularities of a search warrant, courts should avoid "[t]echnical requirements of elaborate specificity once exacted under common law pleadings [as they] have no proper place in this area.").

In view of the foregoing, the Court finds that the warrant satisfies the first prong of the Fourth Amendment's particularity requirement in that it properly incorporates attachments which specifically describe the property at issue and the items to be seized, thus imbuing the warrant with sufficient particularity to withstand the rigors of the Fourth Amendment.[14]

---

[14] In addition to the warrant's lack of particularity, Defendant argued that because "there are no facts alleged in the affidavit that relate to [Merchant's] address, there was no probable cause that would authorize the search of his home." (Dkt. No. 31 at 7-8). The Court finds this argument unavailing. Probable cause is determined based on the "totality of the circumstances," under which a magistrate judge's task is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In reviewing such a determination, the trial court's role is limited "to ensur[ing] that the

### b.     Proper Accompaniment

While the Court finds that the warrant properly incorporated the detailed attachments, the warrant failed to satisfy the second prong of the Fourth Amendment's particularity requirement because the supporting documents did not accompany the warrant when it was served on Defendants. *Wright*, 493 F. App'x at 268.

In *Groh,* the Supreme Court held that "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." 540 U.S. at 557. Therefore, the particularity requirement of the Fourth Amendment is not "vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection." *Id.* In other words, in order to comply with the dictates of the Fourth Amendment, a warrant must either state the property to be searched and the items to be seized on its face or "incorporate other documents by reference, [which should then] accompany the warrant." *See id.* at 558; *see also Wright*, 493 F. App'x at 268-70 (holding that in addition to requiring warrants to expressly incorporate attachments, such documents "must accompany the warrant [upon execution]; [they]

---

magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-9 (internal citation and quotation marks omitted). A review of TFO President's affidavit in this case convinces the Court that Magistrate Judge Cannon had a "substantial basis" for concluding that there was probable cause to issue the search warrant for Defendant's property. TFO President's affidavit detailed his observations that the property was "surrounded" by blue tarp and that there was a large blue water tank on the premises—indications, based on TFO President's experience, that the premises were being used to maintain a marijuana grow operation. In addition, TFO President's observations included two aerial surveillances wherein he observed what appeared to be marijuana plants on the property. *See United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) (finding that the search warrant was sufficiently supported by a finding of probable cause as the officer's affidavit "contained ample facts" and "described in detail" circumstances that "evidence of wrongdoing would be found at the premises"). This evidence, together with the detailed description of the property discussed above, was sufficient to support the issuance of a search warrant for the property described—which was Merchant's property.

cannot be impounded and sealed," in order to satisfy the Fourth Amendment's particularity requirement . . . [s]ealed affidavits cannot rescue a warrant that otherwise lacks particularity."); *Yusuf*, 461 F.3d at 394 ("[A] warrant may incorporate a supporting application or affidavit, so long as the warrant cross-references the supporting document and the document accompanies the warrant.") (citing *Groh*, 540 U.S. at 558)*; Bartholomew*, 221 F.3d at 428-29 ("The requirement that affidavits accompany warrants which themselves lack particularity serves two purposes: one, to limit the agents' discretion as to what they are entitled to seize; and two, to inform the subject of the search what can be seized."). Otherwise, the resulting search is "clearly 'unreasonable' under the Fourth Amendment . . . [and thus] unconstitutional." *Id*. at 563.

*United States v. Franz*, 772 F.3d 134 (3d Cir. 2014), is most instructive here. In *Frantz*, the agent who prepared the warrant application wrote "[s]ee attached sheet" on the section of the warrant asking for a description of the property and also submitted an attachment, Attachment B, listing the items to be seized. The magistrate judge approved the warrant and granted the government's motion to seal the warrant's affidavit and accompanying papers. *Id*. at 139.When law enforcement executed the warrant, the agent provided the defendant with a copy of the warrant but did not provide copies of the attachments. *Id*. at 139. The appellate court affirmed the district court's finding that while the warrant was "facially valid when issued, [its] execution [] violated [defendant's] Fourth Amendment rights because, as presented to [defendant], it did not contain a particularized list of items to be seized." *Id*. at 144. In other words, because the agent "did not provide [defendant] with Attachment B to the warrant, which described the items to be seized, the warrant was facially invalid when it was executed." *Id*. at 140.

Here, on August 23, 2018, Magistrate Judge Cannon issued the search warrant, and the warrant application and its attachments were filed under seal. (Criminal Action No. 18-mj-27, Dkt.

No. 1). On August 24, 2018, the search warrant was executed. TFO President presented Merchant and his wife a copy of the warrant. However, it is undisputed that, as with the agent in *Franz*, TFO President did not present Defendants with the attachments which were expressly referenced in the warrant—including Attachment C, which listed the items to be seized. TFO President's failure to provide Defendants with the attachments rendered the warrant "facially invalid when it was executed." *Franz*, 772 F.3d 140. The fact that the attachments were under seal at the time of the search does not alter this conclusion because even documents under seal—if they are expressly incorporated in a warrant that otherwise lacks particularity—must accompany the warrant. *Wright*, 493 F. App'x at 268-70. Alternatively, the warrant on its face should have listed the items to be seized rather than simply relying on a reference to Attachment C. *Bartholomew*, 221 F.3d at 429.

Because the warrant, as executed, was not accompanied by the incorporated supporting documents when it was presented to Defendant, it failed to "inform the subject of the search [as to] what can be seized," *id*. at 429, a fact that TFO President acknowledged in his testimony. Accordingly, the warrant failed to satisfy the second prong of the Fourth Amendment's particularity requirement. *Wright*, 493 F. App'x at 268-70; *Bartholomew*, 221 F.3d at 429; *Franz*, 772 F.3d at 144.

## B.    Exclusionary Rule

Having decided that the warrant failed the particularity requirement, the Court must now determine whether suppression of the evidence is the appropriate remedy. The Court finds in the negative.

### 1.    Applicable Legal Principles

The Third Circuit has stated that exclusion is deemed to be a court's "last resort, not [its] first impulse." *Franz*, 772 F.3d at 145 (quoting *Hudson v. Michigan,* 547 U.S. 586, 591 (2006)).

The purpose of the exclusionary rule is to "deter future Fourth Amendment violations." *Wright*, 493 F. App'x at 271. Thus, "[w]here suppression fails to yield appreciable deterrence, exclusion is clearly [] unwarranted." *Davis v. United States*, 564 U.S. 229, 237 (2011) (internal citation and quotation marks omitted).

To assess whether the exclusion of evidence is warranted, a two-pronged analysis applies: (1) determine whether exclusion would have "'[r]eal deterrent value,'" and (2) determine "'whether the deterrence benefits of exclusion [] outweigh [the] heavy costs.'" *Wright*, 493 F. App'x 2at 271 (quoting *Davis*, 564 U.S at 237). The cost-benefit analysis is of particular importance because:

> [e]xclusion exacts a heavy toll on both the judicial system and society at large . . . [as] [i]t almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.

*Davis*, 564 U.S. at 237.

To determine the applicability of the exclusionary rule under the circumstances here, the totality of the circumstances must be assessed, wherein consideration is not limited to the defects in the warrant but also encompasses "the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known [in obtaining and executing it]." *Franz*, 772 F.3d at 147. "'To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Id*. at 145 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). Specifically, "[w]hen law enforcement officers 'exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights,'" or where the police conduct is shown to be "'recurring or systemic negligence,'" the deterrent value of exclusion outweighs the societal costs and suppression of evidence is justified. *Franz*, 772 F.3d at 145 (quoting *Herring*, 555 U.S. at 144

(2009); *Wright*, 493 F. App'x at 271 (same). The exclusionary rule does not apply when it is shown that law enforcement "act[ed] with an objectively reasonable good-faith belief that their conduct [was] lawful, or when their conduct involve[d] only simple, isolated negligence . . ." *Davis*, 564 U.S. at 238 (internal citation and quotation marks omitted).

## 2. Analysis

At the suppression hearing, Defendant argued that suppression of the evidence is warranted under these circumstances, claiming that the fact that TFO President did not provide Defendants with a copy of the attachments demonstrated "gross negligence," particularly because as a well-trained officer he should have known better than to deprive Defendants of copies of the attachments referenced in the warrant which would have informed them specifically of the items to be seized. Thus, according to Defendant, the "good faith exception" should not apply here. On the other hand, the Government argued that, even if the warrant failed the particularity requirement, suppression of the evidence here is not the appropriate remedy because TFO President's conduct was neither deliberate nor reckless. The Government maintains that TFO President, despite being trained in executing search warrants, was simply not aware that copies of the attachments should also be provided to Defendants and was just "practicing what he was taught."[15]

Here, TFO President sought and obtained a valid warrant from the Magistrate Judge. However, the warrant, when served upon Defendants, was not accompanied by the supporting

---

[15] The Government also argued during the hearing that, rather than a constitutional violation, TFO President's failure to provide Defendants with copies of the warrant's attachments was instead simply a technical violation of Rule 41, Fed.R.Crim.P., that does not necessitate suppression of evidence. However, legal precedent establishes that the particularity requirement of the Fourth Amendment includes accompaniment of documents incorporated in the warrant upon execution, and that a warrant's failure to satisfy the particularity requirement constitutes a violation of the Fourth Amendment. *Groh*, 540 U.S. at 558.

documents it expressly incorporated by reference—even though those documents were readily available because copies were located in TFO President's vehicle. TFO President reported that he initially did not have the warrant or any of the supporting documents on his person upon the officers' initial entry into Merchant's residence, but that he went back to his vehicle and retrieved the warrant only and presented it to Defendants. TFO President testified that he had no real reason for not providing the attachments, except, as he said, "that is the way I've always done it. I've never been questioned or told about it." TFO President further testified that while he was trained to leave a copy of the warrant with individuals, he did not recall a similar directive pertaining to a warrant's incorporated supporting documents. TFO President also testified that his experience with HIDTA did not teach him otherwise, as he could not recall any instances in which incorporated supporting documents were provided to individuals.

In light of the foregoing, the Court does not find that TFO President acted deliberately, recklessly, or with gross negligence, in executing the warrant. While TFO President should have presented the supporting documents to Defendants along with the search warrant, that misstep— which stemmed from his lack of awareness that he was required to present a copy of such supporting documents—does not establish that TFO President's conduct was "sufficiently deliberate" and "sufficiently culpable" to warrant the exclusion of the evidence seized from Defendant's property. *Franz*, 772 F.3d at 145 (quoting *Herring*, 555 U.S. at 144). Further, the fact that the officers here did not exceed the scope of the warrant's authorization weighs in favor of a finding that TFO President acted, as a whole, "objectively reasonable." *See Franz*, 772 F.3d at 148.

The Court recognizes that, unlike the agent in *Franz* who was inexperienced in executing search warrants, *Franz*, 772 F.3d at 149, TFO President is an experienced officer who has

undergone training and has been involved in the execution of numerous search warrants. However, this does not demonstrate that TFO President acted recklessly or with gross negligence. TFO President testified that he did not learn either from his training or his previous experience that he was required to serve supporting documents with a search warrant. While TFO President acknowledged that without the supporting document listing the items to be seized, Defendant would be unaware of what the officers were searching for on the property—and thus TFO President's actions may be deemed negligent—"[m]erely negligent behavior does not" merit exclusion. *Wright*, 493 Fed. App'x at 272.

The Court also does not find that TFO President's conduct here presents "recurring or systemic negligence" so that "benefits of deterrence [] outweigh the costs." *Herring*, 555 U.S. at 141-46. Such "recurring or systemic negligence," which warrants the application of the exclusionary rule, pertains to circumstances where the officers' conduct demonstrates a "routine" or a "widespread pattern" of constitutional violations. *See id.* at 146-47. But there is no evidence here that TFO President's negligence in failing to provide the supporting documents is "routine or widespread." *Id*. TFO President testified that he has been a case agent in five search investigations and participated in about 10-12 others. As discussed above, he further testified that he was unaware as to whether, as a matter of course, other officers provided copies of such attachments to individuals whose properties are subject to a search and that in his training in executing search warrants, he did not recall being instructed that he should also serve attachments along with the warrant.

Instead, under the totality of the circumstances here, with the exception of his failure to serve the attachments with the warrant, the Court finds that TFO President otherwise exhibited great care in applying for and executing the warrant. The record reflects that TFO President

conducted surveillance of the property on several occasions, both from the ground and the air; he

went to the Lieutenant Governor's office in an attempt to obtain the correct address for the property

he was surveilling; and he provided a very detailed description of the property to be searched,

including the blue tarp fencing, the color of the house, the water tank and its specific location, and

even the color of the cars parked on the property. The record further reflects that the search team

was briefed on two occasions prior to the execution of the search in order to review the items to

be seized during the search; TFO President personally participated in the search; and no items

beyond the scope of the warrant was seized during the search. These surrounding circumstances

belie any suggestion that, in failing to serve the attachments with the warrant, TFO President acted

in deliberate or reckless disregard of Defendant's constitutional rights.

Because the Court finds that TFO President's failure to serve the attachments to the warrant

neither stemmed from deliberate, reckless, or grossly negligent conduct, nor demonstrated

recurring or systemic negligence, the application of the exclusionary rule here would not serve a

sufficient deterrent effect and justify the costs of suppression. *Franz*, 772 F.3d at 149. Accordingly,

the Court finds that, to the extent that Merchant's Motion to Suppress is grounded in an illegal

search stemming from an invalid search warrant, his Motion will be denied.[16]

---

[16] Defendant also argues that the officers' conduct here violated the knock and announce rule.
(Dkt. No. 31 at 6-7). "Under the Fourth Amendment and 18 U.S.C. § 3109, a law enforcement
officer executing a search warrant at a private dwelling generally must knock and announce his
authority and purpose before entering, and may forcibly enter after doing so only if he is refused
admittance or when necessary to liberate himself or a person aiding him in the execution of the
warrant." *United States v. Briggs*, 2008 WL 1745661, at *10 (E.D. Pa. Apr. 14, 2008), *aff'd*, 347
F. App'x 750 (3d Cir. 2009) (internal citations and quotation marks omitted). Here, the Court finds
that there was no violation of the knock-and-announce rule, as all three witnesses testified that,
prior to forcibly entering Merchant's residence, the officers had knocked and announced their
presence. In fact, Merchant himself testified that he heard someone say, "open up, police." Further,
as Defendant concedes (Dkt. No. 31 at 6-7), even if there was a violation of the knock-and-
announce rule, under *Hudson*, suppression of the physical evidence seized from Defendant's
property would still not be warranted because "the knock-and-announce rule has never protected

### III.    SUPPRESSION OF STATEMENTS

Merchant argues that all statements made by him must be suppressed as they were impermissibly obtained after he had invoked his right to counsel and during a custodial interrogation in violation of *Miranda*. (Dkt. No. 31 at 8-11). Merchant further contends that any alleged waiver of his *Miranda* rights was not made knowingly or voluntarily. *Id*. at 11-13. Finally, Merchant argues that since "his arrest and detention were unlawful[,] the statements that were taken during the subsequent illegal custody must be suppressed" as "fruit of the poisonous tree." *Id*. at 13.

In opposition, the Government contends that Merchant never invoked his right to counsel and argues that none of Merchant's statements were obtained in violation of *Miranda*. (Dkt. No. 32 at 11). Further, the Government contends that Merchant's waiver of his *Miranda* rights was made knowingly and voluntarily. *Id*. at 11-13. According to the Government, because no constitutional violations occurred here, Merchant's statements are not "fruit of the poisonous tree." *Id*. at 14.

The Court finds that suppression of Defendant's statements is unwarranted under the circumstances here.

#### A.    Miranda

Merchant claims that he was subjected to a custodial interrogation in violation of *Miranda* when he was detained at his residence (Dkt. No. 31 at 10), and that any alleged waiver of his

---

[] one's interest in preventing the government from seeing or taking evidence described in a warrant." 547 U.S. at 594. Excluding relevant incriminating evidence as a result of a violation of the knock-and-announce rule is too "considerable" a cost, as "imposing that massive remedy for a knock-and-announce violation would generate a constant flood of alleged failures to observe the rule, and claims that any asserted [] justification for a no-knock entry . . . had inadequate support . . . The cost of entering this lottery would be small, but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail-free card." *Id*. at 595.

*Miranda* rights was not made knowingly or voluntarily. *Id.* at 11-13. While the Government concedes that Defendant was in custody for purposes of *Miranda* when he was detained at his home, it maintains that he was not subjected to an interrogation and therefore *Miranda* warnings were not warranted. Further, as it pertains to statements Merchant made during his questioning, the Government contends that Merchant's execution of a valid waiver belies his contention of a *Miranda* violation. (Dkt. No. 32 at 11-13). The Court agrees with the Government and finds that no constitutional violations occurred to warrant suppression of Defendant's statements.

### 1.     Applicable Legal Principles

The Fifth Amendment's Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479).

*Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). A suspect is "in custody" when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting

*California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. Appx. 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980)).

"Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he [] validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000). "The Supreme Court has characterized this as a 'heavy burden.'" *United States v. Boyce*, 2015 WL 856943, at *7 (D.V.I. Feb. 26, 2015) (citing *Miranda,* 384 U.S. at 475). A person may "waive effectuation of these [*Miranda*] rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also United States v. Stuckey,* 441 F.2d 1104, 1105 (3d Cir. 1971).

Two factors affect the determination whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the *"totality of the circumstances* surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421 (1986) (internal citation omitted) (emphasis added). Specifically, in analyzing the totality of the circumstances, courts must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Briscoe*, 69 F.

Supp. 2d at 741 (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)). "Examples of 'traditional' indicia of coercion are 'the duration and conditions of detention, the attitude of the interrogators, defendant's physical and mental state, and other pressures affecting defendant's powers of resistance and self-control.'" *United States v. Rose*, 189 F. Supp. 3d 528, 536 (D.V.I. 2016) (quoting *Briscoe*, 69 F. Supp. 2d at 741 n. 1). Another important factor that may impact voluntariness is the defendant's familiarity with the criminal justice system, *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005), wherein a defendant with experience with the criminal justice system precludes a showing that he is "dumb as to [his] rights." *United States v. Durham*, 741 F. Supp. 498, 505 (D. Del. 1990) (quoting *Miller v. Fenton*, 796 F.2d 598, 606 n. 8 (3d Cir. 1986)). "A necessary predicate to a finding of involuntariness is coercive police activity. Further there must be some causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108 (internal citation omitted); *Connelly,* 479 U.S. at 164 (a statement is involuntary if it is the product of overreaching police conduct).

### 2. Analysis

#### a. Interrogation Under Miranda

In order to determine whether a *Miranda* violation has occurred, the Court must make a determination as to whether Merchant's allegation that he was impermissibly questioned at his residence is credible. The Court does not find Merchant's claim credible.

According to the evidence of record, as soon as the officers forced entry into the home, they encountered Merchant and his family. Merchant was placed against the wall and searched. While the officers called out to search for weapons, Merchant said he had no weapons. Merchant was handcuffed and brought outside with his family. TFO President then presented him with a copy of the warrant, and asked him his name and his address. Merchant confirmed his name, but

it was James-Merchant who informed the officers that they had the wrong address.

While both TFO President and SA Latchman testified that Merchant was not questioned by any of the officers while the search was being executed, both officers also acknowledged that they were not with Merchant during the entirety of the search. Thus, one might argue that it is possible that other officers may have questioned him. But this possibility does not render Merchant's claim credible. Indeed, the Court finds that the dearth of information surrounding this claim is telling. For example, Merchant offered no testimony regarding who questioned him, what questions were asked of him, and what he said in response to such questioning. Accordingly, the bare allegation that he was questioned—without more—does not lend credibility to Merchant's contention.

"[T]he presence of **both** a custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. 1997) (emphasis in original); *see also Alston*, 34 F.3d at 1244 (same). Here, while it is not disputed that Merchant was in custody for purposes of *Miranda* when he was handcuffed and directed to sit in front of his house while the officers conducted a search of his property, the Court finds that no interrogation of Merchant of the nature that would trigger *Miranda* transpired.[17] Accordingly, *Miranda* was not triggered and no violation of Defendant's constitutional rights occurred under these circumstances.

---

[17] While TFO President testified that he asked Merchant his name and to confirm his address when he presented him with the warrant, such questions are administrative in nature and are not meant or likely to illicit an incriminating response so as to be considered an interrogation under *Miranda*. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (finding that an officer's questions regarding a suspect's name and address "fall within a 'routine booking question'" exemption from *Miranda* as these questions "reasonably relate[] to the police's administrative concerns," and were not "likely to elicit an incriminating response.").

### b.    Miranda Waiver

The Court must next consider whether, under the totality of the circumstances, the Government has shown by a preponderance of the evidence that when Merchant was questioned at the HIDTA office, the waiver of his *Miranda* rights was made "knowingly, voluntarily, and intelligently." *Stuckey,* 441 F.2d at 1105. Based on the evidence presented, the Court answers this question in the affirmative.

First, the Court finds SA Latchman's testimony to be credible pertaining to his presentation of the Advice of Rights and waiver form to Merchant. The Court credits SA Latchman's testimony that he read the form to Merchant; that Merchant read the form himself; and that Merchant initialed the form as he read it. Further, the Court credits the testimony of both TFO President and SA Latchman that Merchant never indicated that he did not understand what was going on. Nor was there anything else in the record which suggests that Merchant's ability to understand what was happening may have been impaired.

Merchant confirmed that he initialed each right on the Advice of Rights form indicating that he read and understood them. Further, the evidence shows that Merchant confirmed that he understood his rights and was willing to answer questions by writing "Yes" in response to the questions, "Do you understand your rights?" and "Are you willing to answer some questions?" *See* (Govt. Ex. No. 1). By his signature, he also affirmed that: "I have read . . . this Advice of Rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer some questions without a lawyer present." *Id*. Merchant then proceeded to answer the officers' questions for approximately 30 to 40 minutes. These circumstances support a finding of a voluntary waiver. *See e.g., United States v. Herrera-Genao*, 419 Fed. App'x. 288, 292-93 (3d Cir. 2011) (upholding district court's finding that defendant was properly advised of his *Miranda*

rights where there was testimony that "[defendant] was brought to interrogation, verbally advised as to his *Miranda* rights, and then given a Statement of Rights, which he reviewed and signed"); *United States v. Andrews*, 231 Fed. App'x. 174, 176–77 (3d Cir. 2007) (finding defendant's statements voluntary when police advised defendant of his *Miranda* rights, gave defendant a written copy of the *Miranda* warnings, and prompted defendant to read portions of the warnings aloud and write his initials after each warning); *Alston*, 34 F.3d at 1253 (finding that defendant "understood his *Miranda* rights when he signed the waiver," based on defendant's execution of the form "and the testimony of the interrogating officers concerning their recitation of the rights and [defendant's] acknowledgement that he understood them"); *United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980) (providing that a defendant who answers questions after being advised of her rights may be deemed to have waived her rights); *see also United States v. Augusta*, 2018 WL 317972, at *4 (M.D. Pa. Jan. 8, 2018) ("Generally, a validly-executed standard form may suffice to show a voluntary, intelligent, and knowing waiver of one's rights.").

Second, both TFO President and SA Latchman testified that the interview took place in a conference room in a professional atmosphere. TFO President described the atmosphere during the interview as "pleasant" and reported that neither he nor SA Latchman raised their voices. Meanwhile, SA Latchman described the interview as "calm and conversational." Both officers further testified that, during the interview, Merchant was not shackled or handcuffed and neither officer unholstered his weapon. Both officers also testified that while the door was closed, it was not locked. TFO President recalled that they offered Merchant water and he declined, while SA Latchman reported making the bathroom available for Merchant. Moreover, there is nothing in the record to suggest that Merchant's interview was overly long or any evidence that there was "[] repeated or prolonged questioning of Defendant[.]" *United States v. Harris*, 2013 WL 1828549, at

*16 (W.D. Pa. Apr. 30, 2013). Instead, SA Latchman testified that the interview lasted about 30 to 40 minutes. And, again, both officers testified that Defendant did not, at any point, indicate that he did not understand what was going on.

Considering these circumstances, the Court finds that Merchant was not coerced to waive his *Miranda* rights. *See e.g., United States v. Granado*, 2012 WL 12888670, at *2, 7 (E.D. Pa. Feb. 9, 2012), *aff'd,* 523 F. App'x 153 (3d Cir. 2013) (finding that defendant's *Miranda* waiver and his subsequent statements to law enforcement officials were "not tainted by any coercive police action," where, *inter alia*, defendant's interviews took place in an interview room, the officers "did not display any hostility, nor did they threaten, assault, or direct any violence against [defendant]," and the interviews defendant was subjected to were "relatively short," i.e., between an hour and two hours); *Augusta*, 2018 WL 317972 at *4-5 (finding that defendant's waiver of his *Miranda* rights was voluntary where, *inter alia*, there was no evidence that defendant was "verbally or physically threatened, deceived, or otherwise coerced into waiving his *Miranda* rights by the interviewing agents . . . [officers'] guns were holstered during the course of the interview . . . [defendant] was advised of his rights and questioned in a civil, cordial, and conversational tone," and defendant's questioning lasted approximately an hour) (internal quotation marks omitted); *United States v. Whitfield*, 2013 WL 1905112, at *2-3 (E.D. Pa. May 8, 2013) (finding that defendant's *Miranda* waiver was made voluntarily where, *inter alia*, defendant's custodial interrogation lasted only approximately 45 minutes and where defendant did not indicate "he did not understand the rights of which he was advised").

To establish a valid *Miranda* waiver, the Government also bears the burden of proving Merchant waived his rights "knowingly" and "intelligently," i.e., that he understood his *Miranda* rights and the consequences of waiving them. *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

Merchant claims that he repeatedly requested to speak to a lawyer throughout his encounter with the officers. According to Merchant, his understanding was that he had to undergo the booking process before he could see his lawyer, and that prior to an interrogation with the officers he would have an opportunity to meet with his lawyer. Merchant further claims that he did not realize his interview with TFO President and SA Latchman was a formal interrogation as the officers gave him the impression that the meeting was "not on the record" and that they were "just sitting and talking." Finally, while Merchant admitted that he initialed and signed the waiver form, he claims that when asked if he was willing to answer some questions, he answered "yes" only with the "promise" that his lawyer was going to be present with him.

The Court does not credit Merchant's assertions for several reasons. First, based on the totality of the evidence presented, including the relative plausibility of Merchant's and the officers' competing accounts, the Court does not find credible Merchant's testimony that he invoked his right to counsel during his encounter with law enforcement. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) ("[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.") (internal citations and quotation marks omitted).[18] As discussed above, the documentary evidence

---

[18] "The Court judges credibility by considering a number of factors, including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the 'common sense test.'" *United States v. Davis*, 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)). "[A] witness should not be considered any more or less credible because the witness is a law enforcement officer." *United States v. Graham*, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *United States. v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995)).

supports the testimony of the officers that they advised Merchant of his rights (including his right to counsel) and Merchant waived his right to an attorney and agreed to answer questions. Indeed, despite Merchant's claim that he requested an attorney on numerous occasions, the Court finds it telling that the documentary evidence says otherwise—specifically that he was advised of his rights to counsel and that he waived that right. The waiver stated, *inter alia*, that "You have the right to talk to a lawyer for advice *before we ask you any questions*;" "You have the right to have a lawyer with you *during the questioning*;" and "If you cannot afford a lawyer, one will be appointed for you *before any questioning if you wish*." (Govt. Ex. 1) (emphasis added). The Court does not find it credible that, after allegedly insisting repeatedly that he wanted to speak to a lawyer, Merchant would simply surrender the opportunity notwithstanding that the waiver clearly indicated his right to an attorney. Further, because Merchant claimed that he asked to speak to a lawyer while he was being transported in the police vehicle—a claim that TFO President and SA Latchman both dispute—as well as during the booking process, it seems incredible to the Court that such an issue would not have been foremost in his mind when the officers presented him with the *Miranda* waiver which clearly indicated that, by signing it, he was "willing to freely and voluntarily answer some questions *without a lawyer* present." Similarly, Merchant's assertion that he decided to answer the officers' questions because he thought they were "just sitting and talking" is at odds with the Advice of Rights form that he read and signed which clearly states that "[a]nything you say can be used against you in court."[19]

---

[19] Moreover, based on the Court's observations during the suppression hearing, both officers' demeanors on the stand were calm and collected, as they recounted events in an organized and cogent manner. Their testimony remained consistent even as Defense counsel challenged their version of events, particularly pertaining to whether both officers, who transported Merchant to the HIDTA office and conducted the questioning, allegedly ignored Merchant's request for counsel. *See Murphy*, 402 F. Supp. 2d at 570-71 (finding defendant credible in part because "even upon vigorous and effective cross-examination by the [government], his version of the events of

Second, there is nothing in the record to indicate where Merchant obtained his understanding that he must first complete the booking process before he could see his lawyer. TFO President testified that he did not provide Merchant with such information, and the record does not show anyone else who provided Merchant with this information or made such a "promise"—details which should have been, under the circumstances, memorable for Merchant.

Third, under the totality of the circumstances, the Court finds that nothing in Merchant's "background, experience, intelligence . . . and conduct" suggests that he did not understand his *Miranda* rights or the consequences of waiving them. *United States v. Scotland*, 2014 WL 2149644, at *3 (D.V.I. May 22, 2014) (citing *Moran,* 475 U.S. at 421). According to SA Latchman, Merchant informed him that he had completed high school and two years of college and that he had no issues with the English language. Thus, the Court finds that Merchant had the requisite level of understanding when he signed the waiver, i.e., that he understood that he could have a lawyer before any questions were asked and during the questioning, and that he waived those rights by signing the form. *See United States v. Phuong Le*, 2011 WL 913260, at *3 (E.D. Pa. Mar. 11, 2011) (*"*If the totality of the circumstances surrounding the interrogation demonstrates that the defendant had the required level of comprehension, a court may properly conclude that the waiver

---

that evening never wavered"). Finally, while both TFO President and SA Latchman have an interest in the outcome of the proceeding from a professional perspective because of their work on the case, Merchant—whose liberty is at stake—clearly also has a substantial personal interest in the outcome of this matter. The Court recognizes, however, that while "[d]efendants in criminal cases always have much riding on the outcome . . . it would be manifestly unfair and highly improper for that overtly or subliminally to be the determinative factor in judging a defendant's testimony. All of the circumstances must be considered and a credibility determination arrived at based on reason and logic." *Murphy*, 402 F. Supp. 2d at 571. Consistent with this approach and as discussed herein, it is the combination of factors that undergirds the Court's conclusion as to the credibility of the testimony of both officers, and Merchant's lack of credibility on the disputed points.

was knowing and intelligent."); *Henderson v. Hendricks*, 2005 WL 3406434, at *10 (D.N.J. Dec. 13, 2005) (finding that defendant validly waived his *Miranda* rights where "there were no factors concerning [defendant's] age, mental condition, or education, suggesting that he did not understand his *Miranda* rights or the consequences of waiving those rights.").

At the hearing, Merchant also contended that because he has never been arrested before, he does not possess the requisite knowledge about the criminal justice system, implying that he did not waive his rights knowingly. Although Merchant's familiarity with the justice system is a factor that a court should consider as to whether his statements were made knowingly, *see Jacobs*, 431 F.3d at 108, there is no indication here that Merchant's lack of experience with the criminal justice system prevented him from understanding what was happening and what was being said to him during his questioning. *United States v. Williams*, 2018 WL 4781174, at *11 (D.V.I. Oct. 2, 2018). This is especially so in view of his level of education and the plain language contained in the Advice of Rights form. In this latter regard, the Advice of Rights form asked two simple questions: "Do you understand your rights?" and "Are you willing to answer some questions?" (Govt. Ex. No. 1). Merchant wrote "Yes" in response to both questions and proceeded to speak with TFO President and SA Latchman for 30 to 40 minutes, thereby giving every indication that he understood the contents of the form. *See Whitfield*, 2013 WL 1905112 at *2 (finding that defendant knowingly waived his *Miranda* rights in part due to the "plain, simple language on the pre-printed 'Advice of Rights and Waiver' form, which [defendant] signed"). By signing the form, Merchant also affirmed that he understood his rights. *See* Govt. Ex. No. 1 ("I understand what my rights are."). Consequently, the Court cannot give credence to Merchant's self-serving and uncorroborated testimony that he was operating under a misunderstanding as to what was transpiring during his interrogation.

In view of all of the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that Merchant's *Miranda* waiver was made "knowingly, voluntarily, and intelligently." *Stuckey,* 441 F.2d at 1105. Further, because the Court finds that no constitutional violation occurred here, Defendant's statements are not "poisonous fruit." Accordingly, Merchant's Motion to Suppress the statements will be denied.

## IV.    CONCLUSION

In view of the foregoing, the Court will deny Defendant Colin Merchant's "Motion to Suppress Physical Evidence and Statements."

An appropriate Order accompanies this Memorandum Opinion.

Date:  August 23, 2019

_____/s/_____
WILMA A. LEWIS
Chief Judge
